## Case No. 15,668.

UNITED STATES v. MACDONALD et al.

[2 Cliff. 270;[1] 26 Law Rep. 558.]

Circuit Court, D. Maine. April Term, 1864.[2]

COLLECTOR OF CUSTOMS — EMOLUMENTS — PUBLIC STOREHOUSES—EXPENSES.

1. Provision for commissions and allowances to collectors of customs was first made by the act of July 31, 1789 [1 Stat. 29].

---

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

[2] [Affirmed in 5 Wall. (72 U. S.) 647.]

2. New regulations were instituted by the acts of February 18, 1793 [Id. 316], of March 2, 1799 [Id. 627], and by the compensation act.

3. A maximum rate of compensation was first prescribed by the act of the 30th of April, 1802 [2 Stat. 172].

4. By the act of May 7, 1822 [3 Stat. 693], collection districts were divided into two classes, viz. the enumerated and non-enumerated ports.

5. The emoluments of collectors of the non-enumerated ports might reach the sum of four thousand dollars; but the collector, after deducting the necessary expenses incident to his office, was required to pay any excess over that sum into the treasury of the United States.
[Cited in Donovan v. U. S., 23 Wall. (90 U. S.) 399.]

6. The maximum rate of compensation allowed to collectors of the non-enumerated ports was three thousand dollars, and a similar provision relating to any excess over that sum was made, as in the first-named class.
[Cited in Donovan v. U. S., 23 Wall. (90 U. S.) 399.]

7. By the act of March 3, 1841 [5 Stat. 432], collectors were required to include in their quarter-yearly accounts all sums received by them for storage of goods in the public storehouses for which a rent was paid beyond the rents paid by the collectors.
[Cited in U. S. v. Lawson, 101 U. S. 166; U. S. v. Ellsworth, Id. 173.]

8. In U. S. v. Walker, 22 How. [63 U. S.] 313, the conclusion of the court is, that the compensation of a collector of one of the enumerated ports may be six thousand dollars, and of the other class five thousand.

9. Collectors are charged with the custody and control of all merchandise warehoused under the laws of the United States, and it is their duty to demand and receive of the importer the appropriate expenses of such custody and control.

10. The sums thus demanded and received by collectors are storage within the meaning of the act of March 3, 1841, whether the goods were deposited in stores leased by the United States, or other storehouses.

11. Whether deposited in public or other storehouses, the goods were to be kept under the joint locks of the inspector and importer, and such storehouse then became a public storehouse for the purpose of securing goods under the warehouse system.

12. Under the act of March 3, 1841, as well as by all the subsequent acts of congress upon the same subject, private bonded warehouses are public storehouses, and collectors are authorized to retain, as part of their emoluments, sums received for the deposit of importations in such bonded warehouses, under the same provisions applicable to public storehouses.

13. When deposit of merchandise was made in public or private stores, appropriate expenses were to be paid by the party making the deposit; and the whole proceedings show that the goods in both cases alike were regarded as warehoused in the public stores of the United States.

This was an action of debt [by the United States against Moses Macdonald, Levi Morrell, Samuel Jordan, and Harrison J. Libbey], and the case came before the court upon the demurrer of the plaintiffs to the rejoinder of the defendants. The declaration was drawn upon the bond of the first-named defendant as collector of the customs for the district

of Portland and Falmouth in the state of Maine, and the other defendants were his sureties. He was appointed collector prior to the 20th of January, 1858, and between that day and the 18th of April, 1861, received for storage of merchandise in bonded warehouses the sum of $6,281, as appeared by his quarter-yearly account, regularly rendered to the department. The pleadings showed that the moneys so received accrued, were accounted for quarter-yearly, and were retained by the collector, by virtue of his office, for storage of merchandise in bonded warehouses. The rejoinder also alleged that the moneys so received and retained by the collector in any one year did not exceed the sum of two thousand dollars, and the demurrer admitted the allegation. The receipt of the money was admitted by the defendants, but they claimed that the collector lawfully retained it under the act of the 3d of March, 1841, as part of his annual compensation. The plaintiffs denied his right to retain the amount, or any part of it, insisting that collectors cannot lawfully retain as compensation any portion of the moneys accruing from the storage of merchandise deposited in private bonded warehouses.

G. F. Talbot, U. S. Dist. Atty.

The provisions of the fifth section of the act of March 3, 1841, do not apply to the storage of goods in private bonded warehouses. There were in fact no bonded warehouses established or known to the law at the time this act went into operation. See 3 Stat. 469; 4 Stat. 591. Two classes of stores were known to the law at the time of the passage of the act of March 3, 1841, namely, public stores and other than public stores. By the act of March 3, 1841, the source from which the surplus storage is received, and which the collector is allowed to retain, is confined to the public warehouses. 5 Stat. 432. There is no judicial construction by which the strict terms of this statute have been enlarged. The act of August 6, 1846, limited the power of collectors to levy the proper duties upon warehoused goods and the expenses incurred. 9 Stat. 53. The instructions of the secretary of the treasury could not enlarge this power. The instructions to carry into effect this act define the second class of warehouses to be stores in the possession of an importer, in his sole occupancy, which he may desire to place under the customs lock in addition to his own lock. Of the expenses of this kind of warehousing, storage is not reckoned as an item, because for the privilege of storing dutiable merchandise himself, the importer was required to pay monthly to the collector of the port, a sum equivalent to the pay of the officer necessarily in attendance, or one half the amount which would accrue as storage on the goods so stored, at the regular rates charged at stores, class No. 1. It is not necessary to consider whether the act of 1846 authorized

the collector to exact from the importer anything for storing his own goods, since the sum exacted does not exceed the pay of the officer required to be in constant charge of the goods. Storage is not to be incurred, of course, when the importer undertakes to do his own storing. The purpose of the regulations of 1849 was to "separate the government as much as possible from the business of storage"; and it would be strange if these same regulations should prescribe a system of collecting storage when the law of 1846 only authorized the collection of "expenses." The same arguments apply to class 3; i. e. "stores in the occupancy of persons desirous to engage in the business of storing dutiable merchandise under the warehousing act." The same election is given whether to pay the officer in charge or the amount of half-storage at the public stores. See sections 28 and 34, Act 1846; 9 Stat. 53.

From the acts of congress prior to March 28, 1854, and the treasury regulations thereon, it is thus plain that storage as such, in bonded or private stores, could not be considered as the consideration of a legal exaction of imposts from the owner of warehoused goods. None of the provisions of the first or third section of the act of March 28, 1854 [10 Stat. 270], warrant the levying of storage in private bonded warehouses. Nothing is named as chargeable in either class of warehouse, but expenses. When the private warehouses come to be named, storage is not mentioned as an element of expense; it is only provided that the "labor" must be performed by the owner, "at the expense of the owner." By the second section storage is named with labor and other charges on unclaimed goods. In the fourth section storage is mentioned as due in the public stores, labor as performed in the private stores. The treasury regulations of July 5, 1855, and February 1, 1857, under this act, speak of storage as an incident of expense only in the public stores. See section 542, Treas. Reg. Feb. 1, 1857. Since the government carefully framed statutes to separate itself from storage in bonded warehouses, nothing accrued to the government for such storage, and there was no fund from which the collector could retain any sum. The whole argument of defendants is based upon the collector's claim to a share of the "government storage," under the fifth section of the act of 1841. The defendants' replication then is in law wholly insufficient:

First. Because they do not therein say that the storage, which the said Macdonald retained by virtue of his said office of collector, was storage of goods, wares, and merchandise stored in the public warehouses, the storage of goods in the bonded warehouses, which were in fact and in law private stores, not being an expense to the United States, from the sum paid to reimburse which, the said collector might retain any part; nothing being in fact claimed by, due, or paid to the

United States for said storage under the law.

Second. Because they do not therein say, that said storage accrued for goods, &c., stored in the public warehouses for which a rent is paid.

Third. Because they do not therein say, that said sum, &c., as aforesaid retained, was retained from an excess of rent and storage received by the United States for storage of goods, &c., in the public warehouses, for which a rent is paid beyond the rent paid by the said collector.

Fourth. Because they do not therein say, that said sum of $6,281 so retained by the said Macdonald, by virtue of his said office, was retained in instalments of not more than $2,000 for any one year.

Every one of these clauses and limitations in the act of March 3, 1841, is vital and essential. To sustain his claim under the act, the late collector of Portland must bring himself within each of them. To argue that public warehouse means private warehouse, is as hopeless a task as to argue that in a statute public way means private way, or public lands means lands of individual proprietors, or public buildings the houses of citizens. To argue thus, is to disregard the sound maxim that, where one class of several distinct classes is named in a statute or contract, the term becomes one of express exclusion as to other classes of the same general thing or subject. The classification of warehouses as public and private warehouses is not the new suggestion of a distinction for the purposes of the argument, but is a distinction that has been kept up in all the legislation of congress, in all the instructions of the treasury department, and in all the practice of the revenue service from the first establishment of warehousing.

It is equally requisite that storage to be claimed by the collector as emoluments of office must have accrued from rented stores, stores for which a rent is paid by the collector, and also that it must have accrued from an excess of storage received above rent paid, and that in no one year it has exceeded the sum of $2,000. If collectors at each of the ports are permitted to take as emoluments the storage of dutiable goods in private bonded warehouses, where such storage does not exceed $2,000 per annum, then the government, contrary to what may be considered in the warehouse acts as a stipulation between itself and the importer, is exacting an extra duty on foreign merchandise simply to increase the emoluments of collectors.

The inequity of the collector's claim to retain this money becomes more apparent from these considerations. The service rendered in the case of dutiable goods warehoused in bonded stores is either storage, or the care of the customs officer in charge. But the storage is not to be charged to the merchant, who, under the law permitting it, stores his own goods at his own expense.

Only such care of the inspecting officer can be actually charged as expense incurred, although it may be called half-storage for the purpose of fixing its maximum rate. Now to whom ought this in equity to be paid? Not to the collector; for under the law he has rendered no service and incurred no responsibility whatever. For the entry, and various papers and records, required to be made to legalize the warehousing of goods in private stores, he has been remunerated by fees fixed by law. The custody of the goods is in another officer, whose functions are distinct from his. Not to the inspector himself; for he is the employee of the government, and is paid by his regular per diem wages at a rate fixed by law, and because he is prohibited by section 73 of act of March 2, 1790, from taking any extra fee for official service; but clearly to the United States, who, through the inspector employed and paid by them for such service, by the charge and care of the warehoused goods, maintain the security of their lien as the law permits.

The storage which collectors are properly allowed to receive is the excess of storage received for goods stored in the public warehouses above the rent paid by the collectors. In this case the collector appropriated the gross receipts of storage, and also a fund accruing from another source than storage in the public warehouses. The plain provision of the act of March 3, 1841, under which the fund is claimed by defendant is, that in fixing the rates of storage on dutiable warehoused goods, in such of the public warehouses as are rented to the government, if an excess of storage accrues above rents paid, the government donates such excess, when not over $2,000 per annum, to the collector.

Shepley & Dana, for defendants.

The opinion of the court in U. S. v. Walker, 22 How. [63 U. S.] 299, decided three questions: First. Whether the tenth section of the act of the 7th of May, 1822, was repealed by any subsequent act; and if not then, Second. What is the true construction of the act of the 3d of March, 1841? Third. Whether by the true construction of the two acts the defendant had a right to retain to his own use the moneys received from rent and storage, to an amount not exceeding $2,000? The court decided that every collector had the right to retain to his own use storage receipts to the amount and in the manner before indicated. Upon the third question they decided that collectors of the non-enumerated ports may receive as an annual compensation $3,000, and that they are entitled in addition, to whatever sums they may receive for rent and storage not exceeding $2,000; but the excess beyond that sum they must pay into the treasury.

The pleadings admit that the money claimed by the government was received and re-

tained as storage. Then the question is, do receipts for storage of merchandise in bonded warehouses come within the fifth section of the act of March 3, 1841. This act is the first and only one requiring an account from collectors of money received for storage. The aim of the fifth section was to require an account of the storage "heretofore retained by collectors for their own use." To answer the design, the remedy must be regarded as broad as the mischief. It applies to all storage receipts; makes no exclusion. It covers as well the sums of money received for deposit of merchandise in the public stores, under the laws of April 20, 1818, and July 14, 1832, as the receipts (in futuro) from the newly rented stores under the sixth section of the act of 1841. Unless this construction is accepted, and this scope allowed to the provisions in relation to accounting for storage receipts, the mischief intended to be remedied will be but imperfectly met, as there would be entire failure of law, requiring an account, except for the newly rented stores, prescribed in 1841. Not only the storage received from the stores owned by the United States would be unprovided for, but all sums due and accruing for rent and storage, for stores previously rented in the name of collectors, and still occupied as depositories, pursuant to the provisions of law.

Nothing in the language of the fifth section authorizes its limitation in this manner. It provides, in the words following, "that every collector shall render a quarter-yearly account under oath," &c., of all sums of money received "for rent and storage of goods," &c., "which may be stored in the public storehouses, and for which a rent is paid, beyond the rent paid by the collector." The natural meaning of this language, and its only purpose, was to require an account "for the rent and storage of goods," &c., which may be stored in the public storehouses, &c., beyond the rents paid, &c., viz. an account for the profits of custom-house storage. It was not intended to, and it does not, define the place, or prescribe the mode, in which the privilege may be enjoyed. The reference made to the public storehouses, is designatory of the merchandise allowed to be stored, and should not be regarded as characteristic or distinctive of storage, or the sums of money for which an account is required to be rendered quarter-yearly.

If merchandise, and not storage, is designated, the mischief intended to be remedied is completely met, for the enactment relating to all goods allowed by law to be deposited in the public storehouses is both retrospective and prospective. Storage, whenever and wherever derived, comes within its meaning, and must be accounted for in obedience to its requirements.

"Where the interpretation of the revenue laws and regulations are involved, great weight is given to the practice of the government under them, as the contemporaneous construction of their intent and meaning." Relying upon this familiar principle for statutory construction, the practice of the department is most confidently appealed to in support of our last proposition. Both in the enumerated and unenumerated ports, the sources from which storage is derived are the same. The collectors in each class of ports are under the same responsibility, and perform the same duties. Since the law of 1854, no stores have been leased by the government for the deposit of merchandise in course of importation, except for the use of the United States appraisers, at any port where a bonded warehouse existed. The public stores, previously rented for the purpose of storing warehoused or unclaimed goods, were expressly discontinued by the seventh section of the law of 1854. This section directs, "that all leases of stores now held by the United States for the purpose of storing warehoused or unclaimed goods, shall, on the shortest period of termination named in said lease, be cancelled, and that, after the 1st of July, 1855, no lease shall be entered into by the United States, at any port where there may exist a private bonded warehouse. While the government is thus prohibited from renting stores for the purpose of warehousing goods, the law of 1854 provides for custom-house storage by substituting bonded warehouses for the stores previously rented. These bonded warehouses are public stores, being subject, as to rates of storage, to regulation by the secretary of the treasury. The use of these newly constituted depositories for duty-paying importations, was the same as the public storehouses existing anterior to their establishment; and like them, they were appropriated exclusively to receiving foreign merchandise. Importations deposited in the bonded warehouse, were at the sole and exclusive risk of the owner or importer. The new system increased the care and responsibility of collectors, occasioned by the storing of merchandise. The privilege granted to the importer was enlarged. All the rights of the government under previous laws were carefully preserved, and further guaranties provided. The possession of the merchandise was as complete under the new system as the old; in the bonded warehouse, as in the store owned or leased by the government. Cargo taken possession of by the collector might be stored in any private bonded warehouse authorized by the act of 1854, "and all charges for storage" were required to be paid by the claimant in the same manner as though the merchandise had been stored in any public warehouse owned or leased by the United States. See Clark v. Peaslee [Case No. 2,831]. "The meaning of the legislature may be extended beyond the precise words used in the law, from the reason or motive on which the legislature proceeded, from the end in view, or the purpose de-

signed." The aim of the law of 1841 was to require an account of money received as storage from the public storehouses; and as it has been already shown that "bonded warehouses," under the existing laws, are "public storehouses," under the rule laid down, this money must be taken to be within the meaning of that act, notwithstanding its precise words.

In accounting for storage receipts under the law of 1841, the court have decided that in no case was a collector obliged to pay into the treasury anything "but the excess beyond the $2,000," that being the sum allowed as additional compensation. The storage receipts, under the subsequent statute of 1854, coming within the meaning of the former statute, this rule for accounting necessarily obtains. Under it, storage received from bonded warehouses, is allowed as an element of additional compensation for the collectors of the enumerated ports, and it should not be denied to the collectors of the non-enumerated. Previous to 1841, there being no law requiring collectors to account for receipts for storage, they retained whatever sum was not required to pay the rent of the occupied stores, to their own use, and it went to swell the amount of their annual compensation. "To correct that supposed abuse, the act of the 3d of March, 1841, was passed." Congress has passed no subsequent law on the subject; and unless the construction is sustained, that the storage received from bonded warehouses comes within the meaning of this act, the treasury will be in the same dilemma which occasioned its enactment. That is, there will be found no law, requiring collectors to account for receipts of storage from the occupants of private bonded warehouses.

The various suggestions submitted in support of the defendant's claim to retain the money to his own use, demanded by the government, are believed to successfully establish the following conclusive propositions: (1) That the payments by occupants of bonded stores, under the warehouse laws, are storage. (2) That this storage comes within the meaning, and is recognized by the fifth section of the act of March 3, 1841, the true construction of which allows "every collector" an additional compensation out of the profits of custom-house storage. (3) That if these payments are not recognized in the act of 1841, there is no law requiring an account, and they may be retained by collectors. (4) That either view is equally fatal to the demand of the government, and judgment should be given in favor of defendant.

CLIFFORD, Circuit Justice. Unaided by former decisions, the question is one which would require an elaborate consideration, but it is not a new question, as will presently more fully appear. U. S. v. Walker, 22 How. [63 U. S.] 303.

Collectors receive a prescribed sum called salary, but their principal compensation is now, and always has been, derived from certain enumerated fees, commissions, and allowances authorized by acts of congress. Provision for such fees, commissions, and allowances was first made by the act of the 31st of July 1789, which also allowed to those officers certain proportions of fines, penalties, and forfeitures. 1 Stat. 64.

Those regulations were not satisfactory, and new ones were enacted in their place, as appears by the act of the 18th of February, 1793, and by the act entitled "An act to regulate the collection of duties on imports and tonnage," passed on the 2d of March, 1799, and by the compensation act, passed on the same day (1 Stat. 316, 627, 786).

By those several acts collectors of the customs were required to keep accurate accounts of all fees and official emoluments by them received, and to transmit the accounts to the comptroller of the treasury; but the collectors were allowed to retain to their own use, the whole amount of emolument derived from these sources, without any limitation. A maximum rate of compensation was first prescribed by the act of the 30th of April, 1802, as appears by the third section of that act. 2 Stat. 172.

Whenever the annual emoluments of any collector, after deducting the expenses incident to the office, amounted to more than $5,000, the directions and requirements of the act were, that such collectors should account for the surplus, and pay the same into the treasury of the United States. Collection districts were, by the act of the 7th of May, 1822, divided into two classes, usually denominated the enumerated and the non-enumerated ports. 3 Stat. 693.

Emoluments of collectors for the enumerated ports, under the provisions of that act, might reach the sum of $4,000; but the ninth section of that act provided, that whenever the emoluments should exceed that sum in any one year, the collector, after deducting the necessary expenses incident to his office, should pay the excess into the treasury for the use of the United States. The maximum rate of compensation allowed to collectors of the non-enumerated ports, under the provisions of that act, from all sources of emolument therein recognized and prescribed, is $3,000; and the tenth section of the act contains a provision similar to that contained in the ninth section, requiring collectors of the non-enumerated ports to account for, and pay over, the excess beyond the amount allowed as the maximum rate of compensation. Under those provisions, collectors might receive the maximum rate of their offices, if the office produced that amount, after deducting the necessary expenses incident to the office, from all the sources of emolument recognized and prescribed by the then existing laws. No one could receive more than the maximum rate,

and his lawful claim might be much less, according to the amount of business transacted in the office. The compensation of collectors remained without any material change from that time until the act of the 3d of March, 1841, was passed, which is the act that gives rise to the principal question in this case. 5 Stat. 432.

Every collector is required by the fifth section of that act to include in his quarter-yearly account, among other things, all sums received by him for rent and storage of goods, wares, and merchandise stored in the public storehouses, for which a rent is paid beyond the rents paid by the collector.

The supreme court held in U. S. v. Walker, 22 How. [63 U. S.] 313, that, if from such accounting the aggregate sums received from that source exceeded $2,000, the collector, by the true construction of the section, was directed and required to pay the excess into the treasury as part and parcel of the public money. But the same court held, that when the sums so received from that source did not in the aggregate exceed $2,000, the collector might retain the whole amount to his own use, and that in no case was he obliged to pay into the treasury anything but the excess beyond the $2,000. The conclusion of the court, therefore, was, and it was an unanimous conclusion, that the compensation of a collector of one of the enumerated ports may be $6,000, and that the compensation of a collector of one of the other ports may be $5,000, according to the state of the importations, and the amount received from rent and storage. The port of Portland is one of the non-enumerated ports. Consequently the collector here may receive as an annual compensation for his services the sum of $3,000 from the sources of emolument recognized and prescribed by the act of the 7th of May, 1822, provided the office yields that amount from those sources, after deducting the necessary expenses incident to the office, and not otherwise; and in addition thereto, he is also entitled to whatever sum or sums he may receive for rent and storage, provided the amount does not exceed $2,000, but the excess beyond that sum he is required by law to pay into the treasury as part and parcel of the public money. None of these principles are attempted to be controverted by the plaintiffs, nor can they be with any success, as they are definitely settled by the unanimous opinion of the supreme court. The plaintiffs admit that such is the fact, but insist that no storage as such, within the meaning of the fifth section of the act of the 3d of March, 1841, ever accrued to the United States from dutiable merchandise warehoused in any other than the public stores mentioned in the sixth section of the act of the 14th of July, 1832, entitled, "An act to alter and amend the several acts imposing duties on imports." 4 Stat. 591.

They do not controvert the fact that the collector is charged with the custody and control of all merchandise warehoused under the laws of the United States, nor that it is his duty to demand and receive of the importer the appropriate expenses of such custody and control; but the argument is, that none of the sums demanded and received for such expenses are properly denominated storage, unless the merchandise was warehoused and deposited in stores leased by the United States. According to their theory, a collector must account for all sums received for such expenses, in every case under the act of the 3d of March, 1841; but unless the same were received on account of merchandise deposited in a public store held under lease, he must in all cases pay the whole amount into the treasury of the United States. But the construction is one that cannot be sustained. First, because if the act of the 3d of March, 1841, applies at all to the case, that part of it that provides for the appropriation of the money so received, is as applicable to the case as that which requires the account. Secondly, because storehouses other than those owned or leased by the United States, were recognized in the acts of congress prior to the act authorizing collectors to retain to their own use all sums received for storage, not exceeding $2,000 in any one year. Wines and distilled spirits, under the act of the 20th of April, 1818, might be warehoused "in such public or other storehouses" as might be agreed upon between the importer and surveyor, or officer of inspection of the revenue for the port where the wines or spirits were landed. 3 Stat. 469.

Whether deposited in the public or other storehouses, the goods were to be kept under the joint locks of the inspector and importer, and no delivery of the same could be made unless the duties were first paid or secured, nor without a permit in writing, under the hand of the collector and naval officer of the port. Custody and control were the same, whether the merchandise was deposited in a public or other storehouse; and whether in the one or the other, the expenses of safe-keeping were to be paid by the importer or his agent. The importer and the proper revenue officer might agree upon a storehouse, as a place of deposit, other than one owned or then held under lease by the United States; but as soon as the merchandise was deposited in the storehouse, and the locks of the inspector were affixed to the doors, it became a public storehouse for the purpose of securing the goods under the warehouse system. Suppose it to be so, still it is contended by the United States that the provisions of the act of the 3d of March, 1841, do not apply to the bonded warehouses described in the rejoinder of the defendants, because they insist that the bonded warehouses therein mentioned were private bonded warehouses, and they contend that pri-

vate bonded warehouses are not public store-houses within the meaning of that act, which in point of fact is the only question of any importance in the case. As before remark-ed, they concede that the act applies to pub-lic stores, and that collectors are in all cases required to account quarter-yearly, but in-sist that they are not authorized to retain any portion of the amount, because private bonded warehouses are not bonded ware-houses. The instructions of the department require collectors to account quarter-yearly for all sums received as storage, whether the merchandise was warehoused in the stores held under lease, or in bonded ware-houses, or in any other storehouses author-ized to be used for that purpose, as the de-positories of imported dutiable merchandise; and unless the act of the 3d of March, 1841, authorizes that requirement, it is difficult to see on what law the instructions are based. But it is not necessary to place the decision upon that ground, because I am of the opin-ion that private bonded warehouses are pub-lic storehouses within the meaning of that act, and of all the subsequent acts of con-gress upon the same subject. Entry for warehousing, under the act of the 6th of August, 1846, was required to be made in writing, in such form, and to be supported by such proof, as should be prescribed by the secretary of the treasury. Deposit of the merchandise might be made in the pub-lic stores, or in other stores, to be agreed on by the collector or chief revenue officer of the port, and the importer, owner, or con-signee; but the requirement was that the collector should first take possession of the merchandise, and such other stores as were to be secured in the manner provided in the prior act, for the deposit in public ware-houses of wines and distilled spirits, to which reference has already been made. Appropriate expenses were to be paid by the party making the deposit; and the whole proceedings show that the merchandise in the latter as well as in the former case is regarded as being warehoused in the public storehouses of the United States. 9 Stat. 53.

All of the sums in controversy in the case of U. S. v. Walker. 22 How. [63 U. S.] 299, had been received under that law, and yet the distinction set up in this case never oc-curred to the supreme court. On the con-trary, the court in that case expressly held that the collectors of the non-enumerated ports might receive, in addition to the $3,-000 authorized by the act of the 7th of May, 1822, whatever sum or sums they might re-ceive for rent and storage, provided the amount did not exceed $2,000 in any one year; and directed the charges against the defendant in that case to be settled in ac-cordance with those principles. Considered in that point of view, that case is decisive of the question under consideration. The demurrer, it should be remembered, admits whatever is well pleaded. The rejoinder not

only alleges that the whole sum sued for accrued for storage between the 20th of January, 1858, and the 18th of April, 1861, inclusive, but that the sum accrued was ac-counted for quarter-yearly, and retained by the collector by virtue of his office, and that the sum accrued was so accounted for and retained, in sums not exceeding $2,000 in any one year. Taking the admission as made, then it is clear that the only prac-tical question is, whether the bonded ware-houses described in the rejoinder are public storehouses within the meaning of the pro-visions of the act of the 3d of March, 1841, under which the same accrued, and was re-ceived, accounted for quarter-yearly, and retained. Argument upon that question is unnecessary in this court, as the question was recently presented to the court in an-other district of the circuit, and after full consideration was directly decided in the affirmative. Clark v. Peaslee [supra.]

A repetition of the reasons there given for the conclusion is unnecessary, as the opin-ion has been published, and is in the hands of the parties in this case. Half-storage had been demanded by the collector in that case, and the same had been paid by the merchant under protest. Having made the payment under protest, he brought suit to recover. back the money, upon the ground that pri-vate bonded warehouses were not public storehouses within the meaning of the sev-eral acts of congress authorizing the ware-housing of dutiable merchandise. Able coun-sel were heard in support of the proposition, but upon full consideration, this court held otherwise, and gave judgment for the col-lector. Both parties, I believe, have ac-quiesced in that judgment as a correct ex-position of the law of the case, and until reversed by the supreme court, I must ad-here to that opinion. Demurrer overruled. Rejoinder adjudged good. Judgment for the defendants.

[On writ of error this judgment was affirmed by the supreme court. 5 Wall. (72 U. S.) 647.]